**INTERSTATE POWER COMPANY,**
Appellant,

v.

**INSURANCE COMPANY OF NORTH AMERICA, Appellee.**

No. 97–834.

Supreme Court of Iowa.

Nov. 17, 1999.

As Amended on Denial of Rehearing
Jan. 13, 2000.

Richard W. Fields and Mark J. Plumer of Swidler & Berlin, Chartered, Washington, D.C., and John C. Hendricks of Stanley, Lande & Hunter, Davenport, for appellant.

Lawrence P. McLellan and Barbara A. Hering of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, and Paul R. Koepff, Rosemary B. Boller, and Ramon E. Reyes, Jr. of O'Melveny & Meyers LLP, New York, New York, for appellee Insurance Company of North America.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, Des Moines, and Lester O. Brown, Patricia A. Van Dyke, and Kenneth A. Remson of Jones, Day, Reavis & Pogue, Los Angeles, CA, for amicus curiae IES Utilities Company.

Laura A. Foggan, Joseph L. Ruby, and Andrew D. Tabachnik of Wiley Rein & Fielding, Washington, D.C., Fred M. Haskins, Des Moines, and William W. Graham of Law Offices of William W. Graham, Des Moines, for amici curiae Insurance Environmental Litigation Association and Iowa Insurance Institute.

CARTER, Justice.

Interstate Power Company (Interstate), the plaintiff in this declaratory judgment

action, appeals from a summary judgment in favor of the defendant Insurance Company of North America (INA) with respect to Interstate's allegations that INA insured it against liability for environmental cleanup costs at several locations. After reviewing the record and considering the arguments presented, we affirm the judgment in part, reverse it in part, and remand the case to the district court for further proceedings.

The environmental damage that precipitated the present litigation occurred at nine sites owned or formerly owned by Interstate. Manufactured gas had been produced on these sites by Interstate, its predecessors in interest, or third parties. These sites are located in Clinton, Iowa; Mason City, Iowa; Galena, Illinois; Savanna, Illinois; Albert Lea, Minnesota; Austin, Minnesota; New Ulm, Minnesota; Owatonna, Minnesota; and Rochester, Minnesota. A chronology of the operations at these locations is listed below:

| Date | Location | Opening, Closing, Decommissioning |
|---|---|---|
| 1856 | Galena | Plant Opened |
| 1889 | Clinton | Plant Opened |
| 1888 | Rochester | Plant Opened |
| 1902 | Owatonna | Plant Opened |
| 1904 | Albert Lea | Plant Opened |
|  | Mason City | Plant Opened |
| 1906 | Austin | Plant Opened |
| 1907 | Savanna | Plant Opened |
| 1914 | New Ulm | Plant Opened |
| 1932 | Rochester | Plant Closed |
| 1933 | Albert Lea | Plant Closed |
| 1935 | Rochester | Plant Decommissioned |
|  | Austin | Plant Closed |
| 1936 | Owatonna | Plant Closed |
| 1939 | New Ulm | Plant Closed |
| 1945 | Galena | Plant Closed |
| 1946 | Galena | Plant Decommissioned |
|  | New Ulm | Plant Decommissioned |
| 1950 | Owatonna | Plant Decommissioned |
|  | Austin | Plant Decommissioned |
|  | Albert Lea | Plant Decommissioned |
| 1951 | Savanna | Plant Closed |
| 1952 | Clinton | Plant Closed |
|  | Mason City | Plant Closed |
|  | Mason City | Plant Decommissioned |
| 1957 | Clinton | Plant Decommissioned |

During the period from May 1, 1946, until May 1, 1964, INA provided general comprehensive liability insurance to Interstate. Interstate is claiming under the provisions of that insurance coverage relating to "property damage." It urges that such coverage extends to the liability imposed upon it by state and federal agencies for environmental cleanup costs at the sites that we have described.

During the years from May 1, 1946, to May 1, 1961, the INA policy provided that liability for property damage extended to "damages because of injury to or destruction of property including the loss of use thereof, caused by accident." In contrast, personal injury coverage under the policy during this period was provided on an "occurrence" basis. Interstate concedes that, in order for INA's liability policy to be triggered for the 1946–1961 period, it must establish that the environmental contamination that it is required to remediate was the result of accident.

In ruling on INA's summary judgment motion, the district court concluded that it was undisputed in the motion papers that the contamination at issue occurred as a result of coal tar, coke, and other residues from the manufacturing process being allowed to accumulate on the unprotected earth, and thereafter be dissolved by rain, melting snow, or other sources of moisture. This process occurred over a period of decades. The court concluded from these circumstances that the environmental damages at issue here were the result of natural causes rather than being accidental. Although evidence was presented that some fuel spills may have occasionally occurred on these properties, Interstate no longer asserts that such spilling, accidental or otherwise, constitutes an accident or accidents triggering liability coverage under the INA policy. Rather, Interstate contends that the exposure of the coal tar, coke, and other residual solids from the manufacturing operations to natural precipitation is the defining event that constitutes an "accident" for purposes of INA's policy. Other facts which bear upon our decision will be considered in our discussion of the legal issues presented.

## I. *Whether the Alleged Property Damage was Caused by Accident.*

■ In seeking to overturn the ruling of the district court on the policies in effect

for the years 1946 to 1961, Interstate asserts that the district court improperly focused on whether there had been a causative event during the policy period that qualified as an accident. It argues that based on the language of the policy any accidental property damage during the policy period triggered coverage regardless of when and how the subsequent contamination took place. This assertion is designed to controvert temporal considerations contained in the district court's ruling. We believe, however, that it is not necessary to decide the motion for summary judgment based on temporal considerations. What happened here simply does not constitute an accident at any point in time.

■ The controlling consideration in interpreting insurance policies is the intent of the parties. *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co.,* 568 N.W.2d 815, 818 (Iowa 1997); *Pierce v. Farm Bureau Mut. Ins. Co.,* 548 N.W.2d 551, 555 (Iowa 1996). We ordinarily determine that intent from the language of the policy itself unless the policy is ambiguous. *Farmland Mut.,* 568 N.W.2d at 818; *Kibbee v. State Farm Fire & Cas. Co.,* 525 N.W.2d 866, 868 (Iowa 1994). When a policy term is not defined in the policy as in this case, we give the term its ordinary meaning. *Pierce,* 548 N.W.2d at 555.

■ The critical policy language in the present case provides:

I.   Coverage.

The company hereby agrees to indemnify the insured [against]. . . .

. . . .

(b)  Property Damage Liability.

For damages because of injury to or destruction of property, including the loss thereof, *caused by accident.*

(Emphasis added.) The policy language clearly focuses on the cause of the damage rather than the damage itself and requires that the cause be of accidental origin. In *Dico, Inc. v. Employers Insurance of*

*Wausau,* 581 N.W.2d 607, 613 (Iowa 1998), we suggested (based on language in *Farmland Mutual,* 568 N.W.2d at 819) that "ground contamination, occurring over a period of time, falls outside the definition of 'accident.'" The policy provisions in both the *Dico, Inc.* and *Farmland Mutual* cases differ substantially from those involved in the present litigation. Notwithstanding these differences, we accept as a general principle that ground contamination occurring over a period of time from a natural seeping process is not accidental when the sources of the contamination are manufacturing waste allowed to accumulate on or in the earth over a period of several decades. We find no error in the district court's granting of summary judgment for INA for the policy years 1946–1961.

## II.   *Whether the District Court Correctly Granted Summary Judgment for the 1961–64 Policy Years.*

■ The district court also granted summary judgment for INA for the policy years between May 1, 1961, and May 1, 1964. We agree with Interstate that this was a gratuitous act on the part of the court because INA's summary judgment motion only extended to matters relating to the policies in effect between 1941 and 1961. Ordinarily this would be ground for reversing that portion of the court's ruling without further discussion. *See Prouty v. Clayton County,* 264 N.W.2d 761, 762 (Iowa 1978) (judgment should be reversed when court's ruling on motion extends beyond the issues presented). We note, however, that the parties have briefed this portion of the district court's ruling on the merits. Because, considering only the issues of law presented, we are in disagreement with the court's ruling, we consider these issues on the merits in order to provide guidance following remand.

Unlike the earlier policy years where liability insurance for property damage was limited to damage caused by accident,

the policy in effect from May 1, 1961, to May 1, 1964, provided:

> With respect to Coverage I(b) [Property Damage Liability], "occurrence" means either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to or destruction of property during the policy period. *All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.*

(Emphasis added.) The district court denied coverage under this clause on the grounds that (1) no occurrence under the policy definition occurred during the period from May 1, 1961, to May 1, 1964; and (2) Interstate failed to establish that the injury was unexpected and unintentional. We disagree with both of these conclusions.

The court's ruling that no occurrence, as defined in the policy, occurred during the time the policies were in force was premised on two factors. First, the coal tar and other solid residues that were the basis of the contamination had been placed on or in the ground many years before these insurance policies went into effect. Second, the court viewed Interstate's response to INA's defense of untimely notice as a concession that the occurrence on which it was relying to establish coverage occurred at a time after these policies ceased to be in force. To summarize, the district court ruled that any actual occurrence with respect to the damage that occurred was prior to the policy period and that the occurrence relied on by Interstate was after the policy period.

Occurrence is defined so as to include any injury to or destruction of property that unexpectedly and unintentionally oc-

curs during the policy period as a result of a repeated exposure to conditions. The "repeated exposure to conditions" element of the definition is stated as an alternative to the "accident" element.[1] There is nothing in the policy language that requires the repeated exposure to conditions to have occurred during the time that Interstate was operating the manufacturing plants. All that is necessary is that the repeated exposure to conditions cause some damage during the policy period. And this is amplified by the additional language providing "[a]ll damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

In *Weber v. IMT Insurance Co.*, 462 N.W.2d 283 (Iowa 1990), this court interpreted the definition of occurrence in a general liability umbrella policy that contained "repeated exposure to conditions" language similar to that contained in the present policy. We concluded that environmental damage caused by manure spills over a protracted period of time was the result of an occurrence as so defined. In *First Newton National Bank v. General Casualty Co.*, 426 N.W.2d 618 (Iowa 1988), we dealt with an umbrella policy that contained a definition of occurrence that included "repeated exposure to conditions" language similar to that in the present policy. We concluded that the time of occurrence for purposes of that policy was when the actual damages were sustained and not when the act or omission that caused the damage was committed. *First Newton Nat'l Bank*, 426 N.W.2d at 623–24. As a consequence of our holdings in the *Weber* and *First Newton National Bank* cases and the evidence in the record that the damages at issue in the present case were constantly increasing over the passage of time, it may not be concluded as a

---

1. In this respect, the present policy differs from the policy considered by this court in *Dico, Inc.*, 581 N.W.2d at 612–13. The language of the policy considered in *Dico, Inc.* was such that the phrase "repeated exposure to conditions" was considered to be a subset of the general requirement that an accident must have occurred. Based on that analysis, the *Dico, Inc.* case was decided based on the absence of an accident without applying the "repeated exposure to conditions" language.

matter of law that no injury by occurrence occurred during the period between May 1, 1961, and May 1, 1964. The district court erred in concluding otherwise.

Our view of this matter is not diminished by the contents of Interstate's response to INA's defense based on untimely notice. Although it alludes in that response to occurrences antedating the policy period, these statements were intended to identify those occurrences that alerted it to the need for providing notice to the insurance company. As will be discussed further in the following division of this opinion, those occurrences involved an entirely different set of circumstances than the occurrence or occurrences that trigger liability coverage for property damage.

■ We also must reject the district court's conclusion that summary judgment was properly granted because Interstate failed to show that the injury or damage at issue here was unexpected and unintended. In viewing the summary judgment motion papers, it is clear that it was not their burden to negate the policy provision requiring unexpected and unintended injury. To obtain a grant of summary judgment on some issue in an action, the moving party must affirmatively establish the existence of undisputed facts entitling that party to a particular result under controlling law. *Griglione v. Martin*, 525 N.W.2d 810, 813 (Iowa 1994); *Goodwin v. City of Bloomfield*, 203 N.W.2d 582, 588 (Iowa 1973). It was INA's burden to show that the injury was expected or intended. This does not appear as a matter of law.

■ This is not a situation analogous to the intentional-act exclusion cases that are relied on by INA. These cases, *Allied Mutual Insurance Co. v. Costello*, 557 N.W.2d 284, 286–87 (Iowa 1996), and *Altena v. United Fire & Casualty Co.*, 422 N.W.2d 485, 488 (Iowa 1988), involve assaultive conduct in which the actors intended the assault and in which the immediate consequences of the actions would be foreseen by the actor. Here, the acts of disposing

of environmental waste were not calculated to produce any immediate harm. Some of the disposal was done by predecessors in interest or third parties. Whether the environmental damage that ultimately resulted was expected or intended by Interstate during the time this insurance was in force is an issue of fact. The district court erred in concluding otherwise.

### III. *Whether the Insurance Coverage Is Abrogated Because of Untimely Notice to the Insurer.*

■ INA urges that, in the event the district court's grant of summary judgment is not upheld in its entirety, it is nonetheless entitled to summary judgment with respect to. the claims involving the Mason City, Clinton, Rochester, and Albert Lea sites. This contention is based on its attempt to secure summary judgment based on a lack of timely notice to it from Interstate concerning these claims.

■ It is established that a successful party in the district court may, without appealing, save the judgment in whole or in part based on grounds urged in the district court but not included in that court's ruling. *Moyer v. City of Des Moines*, 505 N.W.2d 191, 193 (Iowa 1993); *Berger v. General United Group, Inc.*, 268 N.W.2d 630, 634 (Iowa 1978). In the present case, the late-notice defense at the Mason City, Clinton, Rochester, and Albert Lea sites was presented to the district court as an alternative ground for summary judgment. Although that ground was considered by the court, it was not relied on in the ruling granting total summary judgment.

■ In seeking summary judgment on claims arising from the four sites in question, INA relies strongly on our decision in *Fireman's Fund Insurance Co. v. ACC Chemical Co.*, 538 N.W.2d 259 (Iowa 1995). When a notice provision is written as a condition precedent to policy coverage, substantial compliance with such a condition must be shown by the insured.

*Fireman's Fund,* 538 N.W.2d at 262; *Met–Coil Sys. Corp. v. Columbia Cas. Co.,* 524 N.W.2d 650, 654 (Iowa 1994). If the insured does not prove substantial compliance in order to maintain the action against the insurer, the insured must show that failure to comply was excused, or that the requirements of the condition were waived, or that failure to comply was not prejudicial to the insurer. *Met–Coil Sys.,* 524 N.W.2d at 654. Unless the insured meets this burden of showing substantial compliance, or excuse, or waiver, prejudice to the insurer is presumed. *Id.* Although this presumption is rebuttable, unless it is overcome by a satisfactory showing of lack of prejudice, it will defeat the insured's recovery. *Id.*

The delay in giving notice to the insurer in *Fireman's Fund* was five years. We held that this was not substantial compliance with the notice requirements of the policy and was prejudicial as a matter of law. *Fireman's Fund,* 538 N.W.2d at 265. In so doing, we relied in part on *Bruns v. Hartford Accident & Indemnity Co.,* 407 N.W.2d 576, 579–80 (Iowa 1987) (twenty-eight-month delay), and *Henderson v. Hawkeye–Security Insurance Co.,* 252 Iowa 97, 107, 106 N.W.2d 86, 91–92 (1960) (thirteen-month delay). We also noted that environmental cases in other jurisdictions have held that delays of substantially less than five years preclude coverage as a matter of law. *Fireman's Fund,* 538 N.W.2d at 264–65 (citing cases involving ten-month delay, four-year delay, and seven-month delay).

The notice requirement in the present policy differs substantially from that contained in *Fireman's Fund* and the cases discussed therein. In those cases, the policies required prompt notice of an occurrence giving rise to the liability of the insured. In the present case, the policy requires prompt notice of an occurrence "reasonably likely to involve liability on the part of the [insurer]." This language must be applied within the context of INA's liability as an excess insurer over and above the limits of Interstate's primary liability insurance coverage.

In *Canadyne–Georgia Corp. v. Continental Insurance Co.,* 999 F.2d 1547 (11th Cir.1993), the federal court considered a similar clause in an excess or umbrella policy. The duty to give notice in the *Canadyne–Georgia* case was expressed in language that required the insured to give " 'prompt written' notice upon knowledge that an 'occurrence presents the potential that [the insurer] may be liable.' " *Canadyne–Georgia Corp.,* 999 F.2d at 1549. The underlying liability policy limits in that case were $500,000, and the court held that the insured knew the potential for the environmental costs to exceed that amount long prior to giving notice to the company. *Id.* It held that the notice that was given was insufficient as a matter of law and denied coverage on that basis. *Id.* at 1556.

Sometime in 1987 Interstate gained possession of a report of potential environmental problems from waste disposal at manufactured gas plants. A portion of this report identified the Mason City, Clinton, Albert Lea, and Rochester sites at issue here as being potentially contaminated. In September 1989 data obtained by Interstate at the Midwest Gas Association's Hazardous Waste Management Conference indicated:

Cleanup of [manufactured gas sites ("MGS") ] is now an EPA/state priority and represents a great cost threat to gas utilities. A single MGS cleanup may cost upwards of several million dollars per site, with costs dependent on such factors as waste migration, whether EPA or state EPA directs the cleanup, and the choice of remedy....

. . . .

The "lesson" of the 1986 scoring package is that EPA will list MGS and gas utilities will face Superfund liability. While gas utilities may, like any responsible party, file comments disputing EPA's HRS, the track record for removing sites from the NPL is far below 1%. Such facts underscore the need for utili-

ties to aggressively respond to MGS problems by seeking to take on the lead role in cleaning up MGS rather than waiting for the EPA response.

Interstate's 1990 annual report to shareholders indicated that:

Old manufactured coal gas plants that operated in the late 1800s and the early part of this century are just now being identified as hazardous sites. These plants were dismantled decades ago and some were owned by Interstate, or by companies that Interstate acquired. We have identified eight such sites in the Midwest. Currently, we are working with the Environmental Protection Agency to clean up a site in Mason City, Iowa. We will proceed with investigations of all the sites to determine what, if any, action needs to be taken to protect our environment.

. . . .

Early this century, various utilities including Interstate operated manufactured gas plants which used coal and/or oil to produce fuel for cooking and lighting. These facilities were abandoned or sold approximately a half-century ago when natural gas pipelines were extended into the upper Midwest. The former coal gasification sites are now believed to present a potential environmental hazard.

It is expected that the costs of compliance relating to the above issues will be recovered through the rate-making process. If compliance costs are not recovered, the Company's results of operations and financial position could be adversely affected.

At this time, Interstate's current management had no retained records concerning the company's liability insurance policies for the period between 1946 and 1964. In September 1990 it hired a consultant to research this matter. In October 1990 that consultant advised Interstate of the INA excess policies at issue in this case. Interstate did not notify INA of its potential liability for the environmental damages at the Mason City, Clinton, Albert Lea, and Rochester sites until April 1994.

When the present action was commenced in June 1995, Interstate alleged that as of the second quarter of 1994 it had incurred liability and expenses for the contamination of $2,926,700 at the Mason City site; $6,161,238 at the Rochester site; and $613,423 at the Albert Lea site. Documents in the record indicate that Interstate's underlying liability insurance protection (beneath the INA umbrella) was $50,000 per occurrence during the period from 1961 to 1964.

Given the gross disparity between the costs incurred at the Mason City, Rochester, and Albert Lea sites and other available liability insurance and, based on Interstate's prior knowledge of its potential liability for substantial cleanup costs, we are convinced that the notice given to INA was unreasonably tardy. It was sufficiently tardy to establish the presumption of prejudice applied in the *Fireman's Fund* case and precludes Interstate from availing itself of the coverage afforded by the INA umbrella for environmental damages at these three sites. There is nothing in the record to support a similar conclusion at the Clinton site.

We have considered all issues presented and conclude that the district court's ruling on the motion for summary judgment for the policy years between 1946 and May 1, 1961, is affirmed. The court's ruling on the policy years between May 1, 1961, and May 1, 1964, is affirmed as to INA's liability at the Mason City, Rochester, and Albert Lea sites and otherwise reversed. The case is remanded to the district court for further proceedings. Costs on appeal are assessed thirty percent to INA and seventy percent to Interstate.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

TERNUS, J., takes no part.